UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEREMY R. LAFOND,

          Plaintiff,

                                        **DECISION and ORDER**
     -vs-                               **No. 6:12-CV-6046(MAT)**

MICHAEL J. ASTRUE, Commissioner of
Social Security,

          Defendant.
_____

## I.   Introduction

     Represented by counsel, Jeremy R. Lafond ("Plaintiff" or

"Lafond"), brings this action pursuant to Title XVI of the Social

Security Act ("the Act"), seeking review of the final decision of

the Commissioner of Social Security ("the Commissioner") denying

his application for Supplemental Security Income ("SSI"). This

Court has jurisdiction over the matter pursuant to 42 U.S.C.

§§ 405(g), 1383(c). Presently before the Court are the parties'

competing motions for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

     On August 12, 2009, nineteen-year-old Lafond applied for SSI

benefits with a protective filing date of July 23, 2009, alleging

that he had been disabled since January 2, 1996, primarily on the

basis of attention deficit/hyperactivity disorder ("ADHD"). His

application was denied on October 5, 2009. At Lafond's request, an

administrative hearing was conducted on April 21, 2011, with Administrative Law Judge Lawrence Levey ("the ALJ"), presiding via videoconference. Lafond testified, as did his mother, Barbara Lafond. Vocational expert Ruth B. Rondberg ("the VE") testified by telephone. (T.26-74)[1].

Based upon comments in his written decision (T.11), the ALJ apparently had indicated at the close of the hearing that he was inclined to award benefits. Nevertheless, he issued a decision on May 5, 2011, finding that the law and the record evidence did not permit a finding that Lafond is disabled within the meaning of the Act. (T.8-20). The ALJ's decision denying benefits became the final decision of the Commissioner when the Appeals Council denied Lafond's request for review on December 6, 2011. (T.1-4). Lafond timely commenced the instant action.

## III. Factual Background

### A.    General Biographical Information

Born in 1990, at the time of the April 2011 administrative hearing, Lafond was twenty-one years-old. He was unmarried and lived with his mother and older brother in Walworth, New York. Lafond's mother and father had been separated since he was about

---

[1]

Numerals in parentheses preceded by "T." refer to pages from the administrative transcript, submitted as a separately bound exhibit in this action.

four years-old. Lafond's father lives with his mother and sister in Clifton Springs.

Lafond was diagnosed with ADHD at the age of seven. Beginning in fifth grade, he was placed on a special education track due to his "fairly severe hyperactivity" and "oppositional defiant disorder symptoms[.]" (T.256). Over the years, he was assigned numerous psychiatric diagnoses, including ADHD, Oppositional Defiant Disorder, Disruptive Behavior Disorder, anxiety, depression, and bipolar disorder. Lafond had been trialed on numerous medications, including Ritalin, Clonidine, Risperdal, Depakote, Lithium, and Abilify. He apparently experienced negative side effects with several of the medications, such as extreme weight gain. At the same time, however, his health care providers have found it difficult to determine which medications may have been beneficial, since his compliance has been inconsistent at times.

By 2005, when he was fifteen-years-old, Lafond was classified by the Wayne County School District as a child with an emotional disability. (T.296). Lafond was shifted from one school to another (e.g., self-contained special education classes, Halpern Day Treatment, the Alternative High School) in an attempt to find the academic setting in which he could thrive, but his inability to attend and his disruptive behaviors caused problems in all of them. Lafond's high school career was interrupted by his arrest and

subsequent conviction on charges of burglary and weapons'
possession. Per his mother, the conviction stemmed from Lafond
being talked into acting as a lookout while one of his friends
robbed a gun shop. Lafond served approximately two years in a state
correctional facility where his excessive talking often got him
into trouble with other inmates. He obtained his GED while
incarcerated and successfully completed his probationary term in
December 2010.

**B.   The Evidence Presented at the Hearing**

Lafond testified that he had worked for a half-hour in March
2011, for his uncle's roofing business picking up shingles
(T.37-38). He had done the same quick jobs for his uncle in the
fall of 2010, for one or two days (T.39), just as a way to get him
out of the house. Lafond testified that he was not paid for this
brief work, but that his uncle had instead bought him lunch
(T.37-38).

While he was in high school, his mother arranged an
opportunity for him to work at a garage owned by Tom Huss ("Huss"),
who often gave jobs to local youths who were having academic and/or
behavioral issues.  However, Huss let him go after an hour because
his "mind was too much all over the place" and he could not follow
Huss's directions and the safety regulations in the shop. (T.40).
Lafond testified that he was unable to obtain and maintain
employment because of the "speed of [his] brain" and because his

thoughts were "all over the place trying to do two things at once". (T.42).

Lafond had been seeing his most recent mental health counselor for the past six months (T.43), and was taking Adderall for his ADHD (T.47). With regard to his social activities, Lafond testified that he had a good relationship with his immediate and extended family members and that he had "a few" good friends despite his hyperactivity, excessive talking and "outrageousness" (T.43, 45).

Lafond admitted to having used drugs (marijuana fairly regularly and cocaine on one occasion) in high school. He completed an outpatient substance abuse treatment program through Delphi Drug and Alcohol Council and stated that he no longer used drugs. (T.49-50). Lafond testified that he had applied for a number of jobs, but had never received any job offers (T.53). Sometimes he reported his felony conviction to potential employers, but other times he did not (T.53-54).

The VE testified regarding Lafond's ability to perform various jobs (T.68). The ALJ asked her to assume a hypothetical individual of the same age and having the same educational and employment history as Lafond. (T.69). This hypothetical individual had no exertional limitations, but was limited to jobs that required only simple, routine, and repetitive tasks and that were conducted in an environment free of fast-paced production requirements. Further limitations were as follows: making only simple work-related

decisions; dealing with few, if any, changes in the workplace setting; and having only occasional interaction with coworkers and supervisors. The VE testified that such an individual could perform several jobs, including hospital cleaner (Dictionary of Occupational Titles ("DOT") Code No. 323.687-010), of which there were 500,000 jobs nationally and 40,000 jobs in the State of New York; industrial cleaner (DOT Code No. 381.687-018), of which there were 1 million jobs nationally and 15,000 jobs in New York State; and laundry worker (DOT Code No. 302.685-010), of which there were 600,000 jobs nationally and 40,000 jobs in New York State (T.70).

When asked if there were any jobs that could be performed by an individual having the limitations and symptoms to the extent identified by Lafond and his mother, the VE answered in the negative. (T.71).

**B.    Medical Evidence**

**1.    Physical Impairments**

Lafond has been treated since childhood for mild pulmonary valve stenosis (heart murmur). (T.276-77). He has not required any surgical interventions, and he does not have any physical restrictions from a cardiovascular standpoint. (T.277, 361). As of September 18, 2009, radiological examination showed an enlarged main pulmonary artery, but no evidence of acute cardiopulmonary disease (T.398). Plaintiff had a physical examination on

September 29, 2009, at which Nurse Practitioner ("NP") Suzanne Johnson noted that Plaintiff was "working in the roofing business part time with his uncle" (T. 395). Other than cold symptoms and dental cavities, he had no complaints. An electrocardiogram and echocardiogram showed mild pulmonary valve stenosis and mild pulmonary valve regurgitation (T. 396). NP Johnson noted that he did "not have any physical activity restrictions from a cardiovascular standpoint." (T.396).

### 2. Mental Impairments

Although Lafond has no history of psychiatric hospitalizations, he has been treated for mental health issues since childhood. From the age of seven until he went to prison, he was prescribed medications by his pediatrician, Dr. Larry Denk, and was seen at the Rochester Mental Health Center ("RMHC"). (T.355). After being released from prison, Lafond began therapy on August 18, 2009 (T. 403-27, 428-39), at the Genesee Mental Health Center ("GMHC") with Randy Smart, LMFT ("Smart").

When he commenced treatment at the GMHC, Lafond described his condition as being "far too hyper". (T.438). He was working for his uncle's roofing company to repay him for having paid his legal fees in connection with his criminal case. (T.437). Smart noted that Lafond demonstrated increased motor activity, pressured speech, and occasional racing thoughts. Lafond's thought-process was organized, however, and his thought-content was goal-directed. His short-term

and long-term memory appeared intact; insight, judgment, impulse control, and concentration were assessed as fair. Smart diagnosed Lafond with ADHD, not otherwise specified ("NOS"); and an anxiety disorder, NOS. (T.438).

Lafond saw Dr. Douglas Landy at the GMHC on September 14, 2009. (T.382-83, 434-35). Lafond was pleasant but restless and constantly moving with variable eye contact and a slightly increased rate of speech. Lafond's thoughts were generally goal-directed, his insight was "reasonably good," his mood was "chipper," his judgment was impulsive at times, and his affect was adequate. Lafond's recent and remote memory appeared intact. At the time, Lafond was taking Abilify for what his pediatrician, Dr. Denk, had diagnosed as bipolar disorder. (T.382). Dr. Landy concluded that this diagnosis was made in error, given Lafond did not experience remissions and exacerbations of his hyperactivity as would be expected with bipolar disorder. Dr. Landy diagnosed ADHD, prescribed Wellbutrin, and discontinued the Abilify because Lafond's condition was "not bipolar disorder". (T.383). Plaintiff was directed to continue with psychological counseling.

Dr. Kavitha Finnity, a consultative psychological examiner, saw Lafond on September 22, 2009, at the Commissioner's request. (T.355-58). Although Lafond was "cooperative", his manner of relating was "poor". (T.356). His thought process was "[c]oherent and goal-directed", and he had a "[f]ull range" of affect. (Id.).

Attention and concentration, as measured by his ability to recite "serial 3s", were intact. (Id.). Recent and remote memory skills were intact, as measured by the ability to recall objects and recite digits backwards and forwards. (T.356-57). Dr. Finnity assessed Lafond's cognitive functioning as "below average" and found that his general fund of information was "appropriate to [his] experience". (T.357).

Dr. Finnity described Lafond's judgment and insight as "fair". Her diagnosis was mood disorder, NOS, and ADHD "by history". (T.357). For her "medical source statement", Dr. Finnity stated that

> [Lafond] can follow and understand simple directions and perform simple tasks. He has some difficulty with attention and concentration. He can maintain a regular schedule. He can learn new tasks and perform complex tasks with supervision. He can make appropriate decisions. He may have some difficulty relating with others and dealing with stress.

(T.357). Dr. Finnity recommended that Lafond "continue psychological and psychiatric treatment as well as seek vocational training or job skills training" and opined that his prognosis was "fair". (T.358).

On October 5, 2009, Dr. E. Kamin, a state-agency psychologist, completed a Psychiatric Review Technique Form ("PRTF"). (T.363-76). Regarding the paragraph "B" criteria of the Mental Disorders Listings, Dr. Kamin found that Lafond would have "mild" limitations in the areas of activities of daily living and maintaining social

functioning; and "moderate" limitations in the area of maintaining concentration, persistence, or pace. (T.373). Lafond had no episodes of deterioration, and did not meet the paragraph "C" criteria of the Listings. (T.374).

In the Mental Residual Function Capacity ("MRFC") assessment also completed on October 5, 2009 (T.377-80), Dr. Kamin found that Lafond was "not significantly limited" in the ability to maintain attention and concentration for extended periods but was "moderately limited" in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (T.378). Dr. Kamin determined that Lafond had "no significant limitations" in, among other things, his ability to ask simple questions, to get along with coworkers without distracting them, to maintain socially appropriate behaviors, to be aware of normal hazards, and to travel in unfamiliar places and use public transportation. (T.378). Dr. Kamin opined that Lafond retained the ability to perform "simple tasks". (T.379).

Lafond, accompanied by his mother, saw Dr. Landy again at the GMHC on October 12, 2009, and reported no improvement from the Wellbutrin. (T.432-33). Lafond "communicated, through his mother[,] that he wants to do better but he has had difficulty and because people keep not living up to their end of responsibility, he winds

up having difficulties, such as not getting his SSI, [and] so on and so forth." (T.432). On examination, Dr. Landy found Lafond to be quiet and "rather withdrawn," with his mother doing most of the talking. Lafond was alert and fully oriented, his recent and remote memory appeared intact, and his insight was fairly good. Dr. Landy noted that Lafond's judgment continued to be "impulsive at times." (Id.). Dr. Landy increased Lafond's Wellbutrin dosage, and told him to continue with the talk-therapy he had been doing with his social worker. (T.433).

Lafond met with Dr. Gregory L. Seeger at the GMHC for a medication review on November 23, 2009. (T. 430-31). Lafond was "not sure if the Wellbutrin [was] helping or not" but was having "no adverse side effects from it." (T.430). Lafond was "alert, oriented and cooperative" with "somewhat rapid" speech. (T.430). He reported "concentration issues" but did not appear manic and was "not depressed". (T.430). Dr. Seeger opined that Lafond's insight and judgment "appear[ed] adequate." (T.430). Dr. Seeger diagnosed ADHD and directed Lafond to continue with Wellbutrin XL, 150 mg every morning. (T.430).

Lafond canceled his next appointment with Dr. Seeger on March 17, 2010, and did not show for an April 9, 2010 appointment. (T.430). After having no contact with Smart, his therapist, for three months, Lafond was discharged from treatment at the GMHC on

June 18, 2010 (T.428). Between August 2009, and May 2010, Lafond did not show up for, or cancelled, fourteen sessions. (T.403-27).

Lafond re-started treatment on October 1, 2010, this time at the Outpatient Clinic at the Rochester Rehabilitation Center ("RRC"). (T.474-78). His initial diagnosis was "Attention Deficit/Hyperactivity Disorder, Predominantly Hyperactive-Impulsive Type. (T.474).

On December 17, 2010, he met with Dr. Wendy Rosen at the RRC. Lafond reported that "overall things [we]re going well for him and [he] attribute[d] this in large part to continue[d] treatment with Adderall for ADHD." (T.468). Lafond told Dr. Rosen that without this medication, his mind wandered, he had trouble focusing, he felt restless, and he talked a lot. (T.468). Dr. Rosen stated that his "[c]oncentration [was] fairly good with his medication [30 mg Adderall daily]. . . ." (T.468).

On examination, Lafond was cooperative, his mood was good, and his affect was congruent with his stated mood. (T.469). Although his speech was increased and rapid, it was not pressured. Lafond appeared "restless and fidgety" but denied anxiety. Dr. Rosen assessed his demeanor as "social" and "at ease". His was intact, although he presented as distractible, and his insight and judgment were fair. Dr. Rosen noted that "[o]verall, psychiatric symptoms [were] minimal in the context of Adderall treatment." (T.469). His medication was changed to extended release Adderall at the same

dosage in hopes of attaining additional symptom relief. Dr. Rosen's diagnostic impressions were ADHD, combined type; alcohol and cannabis abuse, rule out dependence, in full sustained remission; deferred Axis II, rule out antisocial personality disorder traits; mild psychological stressors; Global Assessment of Functioning ("GAF") score was 65. (T.469).

A Treatment Plan Review dated December 18, 2010, was signed by Dr. Rosen, Kimberly Carducci, Mental Health Counselor ("MHC"); Matthew Sharpe, Nurse Practitioner-Psychiatry ("NPP"). It is unclear who was the author, although most likely it was MHC Carducci given that hers is the first signature with the date of December 17, 2010. MHC Carducci noted that Lafond had been medication compliant and that he felt that "things are the same". Lafond's parole term was coming to an end, and he expressed a desire to "continue as if he were still on [parole] as a means of avoiding legal trouble." (T.467). MHC Carducci determined that therapy should be continued for an additional three months to address Lafond's current treatment goal of "slow[ing] down so people can tolerate [him]" and short-term objectives (medication management and education; learning and practicing ways to calm down and focus energy; and distinguishing between social situations that are appropriate for high energy and those that are not). (T.467).

On January 28, 2011, Lafond saw MHC Carducci for an individual therapy session. Lafond reported dissatisfaction with the extended

release Adderall, stating it made him feel like a "dud". (T.465). "[F]or a short time, he liked feeling calmer, but soon felt that he was not able to get things accomplished like he could before." (T.465). Apparently, his friends thought he was sick because "he was not acting like himself." (T.465). Lafond was looking for part-time employment as he was not getting many hours at his uncles roofing/plowing business. Lafond stated that therapy was helpful in that it allowed him to reflect on the past month and to create a plan for the future. (T.465).

At a medication review with NPP Sharpe on February 18, 2011, Lafond reported that the extended release Adderall was "not as effective" and he had been returned to the immediate release formulation. Lafond stated that he had "pretty good symptom control despite (or because of) overall lower [therapeutic daily dosage]." (T.463). Lafond was "future oriented" and reported that his mother had noted he was being more responsible of late. Lafond discussed wanting to work part-time, find a new hobby, and investigate serving as a counselor for prison inmates. (T.463).

Lafond saw MHC Carducci on March 5, 2011. He noted that he had put in job applications at many locations but "fe[lt] that based on his felony status, [he] has not had any luck." (T.462). Lafond explained he had been working to find areas in his life where he feels he is able to focus and to improve on techniques that support that ability. (T.462). MHC Carducci assessed Lafond's

GAF as 65 and recommended an additional three months of treatment. His drug regimen remained unchanged from the previous appointment.

## IV.   The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law: (1) Lafond has not engaged in substantial gainful activity since the application date, and has no past relevant work; (2) he has a combination of severe impairments, namely, ADHD and substance abuse in remission; (3) the combination of impairments does not meet the criteria necessary for finding a disabling impairment under the regulations; (4) Lafond has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with certain nonexertional limitations (i.e., simple, routine, and repetitive tasks; an environment free of fast-paced production requirements; the requirement of making only simple work-related decisions; few, if any, changes in the work place; and no more than occasional interaction with coworkers and supervisors); and (5) there are jobs that exist in significant numbers in the national economy that he can perform. (T.13-19).

## V.   General Legal Principles

The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir.

2002). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).

The reviewing court must carefully consider the entire record, examining evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (quoting Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997) (quoting Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Nevertheless, "it is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

This deferential standard is not applied to the Commissioner's conclusions of law, however. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984); see also, e.g., Tejada, 167 F.3d at 773. This Court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. "Failure to apply the correct legal

standards is grounds for reversal." <u>Townley</u>, 748 F.2d at 112. Therefore, this Court firsts reviews whether the applicable legal standards were correctly applied, and, if so, then considers the substantiality of the evidence. <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987).

## V.    The Five-Step Sequential Evaluation

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Act. <u>See</u> 20 C.F.R. § § 404.1520, 416.920; <u>see also</u> <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982) (<u>per</u> <u>curiam</u>); <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999). First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner moves to the second step and considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the Social Security regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience.

If the claimant does not have a listed impairment, the fourth step requires asking whether the claimant has the residual

functional capacity to perform his past work, notwithstanding his severe impairment.

If the claimant is unable to perform his past work, the Commissioner moves to the fifth step, comprised of two parts. First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

Although the claimant has the burden of proof at the first four steps, the Commissioner has the burden of proof at the fifth and final step. See, e.g., Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).

## VI. Plaintiff's Contentions

Plaintiff advances the following arguments in support of his motion for judgment on the pleadings reversing the Commissioner's decision to deny benefits: (1) the ALJ's RFC assessment is not supported by substantial evidence because (a) he failed to properly apply the "special technique"[2]; (b) he failed to properly apply the treating physician rule; and (c) he disregarded Social Security

---

[2] The "special technique" is also referred to as the "psychiatric review technique." Petrie v. Astrue, 412 F. App'x 401, 403, 2011 WL 781901, at **1 (2d Cir. 2011) (unpublished opn).

Ruling ("SSR") 85-15 by failing to engage in an individualized assessment of Plaintiff's ability to cope with stress; (2) the ALJ did not apply the correct legal standards in assessing Plaintiff's credibility; (3) the VE's testimony cannot provide substantial evidence to support the denial of benefits because it was based upon an incomplete hypothetical; and (4) the VE's testimony that Plaintiff cannot engage in work is supported by substantial evidence.

## VII. Discussion

### A.   Failure to Apply the Special Psychiatric Technique

In addition to the typical five-step analysis outlined in 20 C.F.R. § 404.1520, the ALJ must apply the "special technique". E.g., Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). The regulations call for the special technique to be used at the second and third steps of the sequential evaluation procedure to determine whether the claimant has a severe mental impairment and whether a severe mental impairment meets or equals a listed impairment. The special technique requires adjudicators to rate the claimant's degree of functional limitation resulting from any mental impairment in four "broad functional areas" identified in the "paragraph B" and "paragraph C" of the adult mental disorders listings. See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); SSR 96-8p, 1996 WL 374184, at *4. Those four functional areas are "[a]ctivities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decomposition." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

It appears that Plaintiff is arguing that the ALJ failed to utilize the special technique in determining his RFC. See Plaintiff's Memorandum of Law ("Pl's Mem.") at 15 ("At step five it is the Commissioner's burden to produce evidence showing that the claimant retains the capacity to perform these functions [i.e., the basic work-related mental activities specified by the regulations] in a particular work setting.") (citing Aubeuf v. Schweiker, 649 F.2d 107, 112 (2d Cir. 1981); Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999)).

Plaintiff's argument concerning the special technique simply reiterates his contentions that the ALJ erred in making his RFC assessment and crafted an incomplete hypothetical for the VE by omitting limitations identified by Dr. Denk and NPP Sharpe in their medical source statements. See Pl's Mem. at 15-16 (stating that the ALJ erroneously failed to include, inter alia, NPP Sharpe's opinion that Lafond had "serious limitations in the abilities to maintain attention for two hour segments. . . ."). These arguments are addressed elsewhere in this Decision and Order and are without merit, as fully discussed below.

### B. Failure to Properly Apply the Treating Physician Rule in Conducting the RFC assessment

Plaintiff asserts that the ALJ committed legal error when he arrived at an RFC assessment that conflicts with a substantial

aspect of the Mental Residual Functional Capacity ("MRFC") Questionnaire (T.484-88) from NPP Sharpe, whose opinion he assigned "significant weight[,]" (T.18). Lafond also argues that the ALJ failed to give the proper weight to the opinion of Dr. Denk, his pediatrician.

As an initial matter, the regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s). . . ." 20 C.F.R. § 404.1527(a)(2). Section 404.1513(a) lists five categories of "acceptable medical sources," two of which are relevant here (licensed physicians and licensed or certified psychologists). 20 C.F.R. § 404.1513(a). The regulations also permit consideration of opinions by "other sources" to "to show the severity of [the claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d). For purposes of the Act, "other sources" include medical sources not listed as "acceptable medical sources", such as nurse-practitioners, physicians' assistants, and therapists. 20 C.F.R. § 404.1513(d)(1); see also Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) ("[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.") (citation omitted). Opinions from "other

sources" "do not demand the same deference as those of a treating physician[,]" <u>Genier</u>, 298 F. App'x at 108, but the ALJ certainly "has the discretion to determine the appropriate weight to accord the [other source]'s opinion based on all the evidence before him[,]" <u>Diaz v. Shalala</u>, 59 F.3d 307, 314 (2d Cir. 1995).

Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); <u>see also</u> <u>Rosa</u>, 168 F.3d at 78-79; <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993). The ALJ may refuse to consider the treating physician's opinion controlling only if he is able to set forth good reason for doing so. <u>Saxon v. Astrue</u>, 781 F. Supp.2d 92, 102 (N.D.N.Y. 2011) (citing 20 C.F.R. § 404.1527(d); other citation omitted.

Where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, it is not afforded controlling weight. <u>Williams v. Commissioner of Social Sec.</u>, 236 F. App'x 641, 643-44 (2d Cir. 2007); <u>see</u> <u>also</u> <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)); <u>Otts v. Commissioner of Social Sec.</u>, 249 F. App'x 887, 889, 2007 WL 2914449, at **2 (2d Cir. Oct. 5, 2007) (unpublished opn) ("An ALJ . . . he may also reject such an opinion [from a treating source] upon the identification of

good reasons, such as substantial contradictory evidence in the record.") (citation omitted). When a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may properly discount those opinions. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). "Although the final responsibility for deciding issues relating to disability is reserved to the Commissioner, see 20 C.F.R. § 404.1527(e)(1), an ALJ must give controlling weight to a treating physician's opinion on the nature and severity of the claimant's impairment when the opinion is well-supported by medical findings and not inconsistent with other substantial evidence, id. § 404.1527(d)(2)." Martin v. Astrue, 337 F. App'x 87, 89 (2d Cir. 2009) (unpublished opn.).

### 1. Dr. Denk

Dr. Denk, Lafond's pediatrician, wrote a note on his behalf on August 24, 2009, apparently directed to the Social Security Administration. Dr. Denk stated conclusorily that Lafond "clearly is a disabled young man." (T.354). In a subsequent medical source statement, however, Dr. Denk opined that Lafond is not disabled from full-time competitive employment. The Court need not resolve this conflict because, ultimately, the issue of whether a plaintiff is "disabled" is reserved to the Commissioner. 20 C.F.R. § 416.927(e). The Commissioner therefore could not, consonant with the regulations, give controlling weight to this aspect of Dr. Denk's opinion.

Also in the medical source statement, as the ALJ noted, Dr. Denk provided a "detailed opinion" regarding Lafond's mental RFC, opining that Lafond's ability to understand, remember, and carry out simple job instructions is "good", but his ability to understand, remember and carry out detailed instructions is only "fair", and his ability to do the same with complex job instructions is "poor". Dr. Denk further opined that Lafond's ability to behave in an emotionally stable manner is "poor", which seemingly conflicts with his assessment that Lafond's ability to relate predictably in social situations is "fair". If anything, the ability to relate predictably in social situations has posed greater difficulty for Lafond over the years, based upon his treatment notes and his own testimony, although his therapists have noted some improvement in this area (e.g., T.470). Moreover, as Dr. Denk essentially admitted, Lafond's mental state is outside the scope of his expertise. (T.491) ("'[B]ased upon my physical exam', as it says above, it is hard for me to answer these questions [about Lafond's ability to make occupational adjustments, etc.]"). The ALJ ultimately assigned "some weight" to Dr. Denk's opinion "to the extent that it [was] consistent with the objective evidence of record and with Dr. Finnity's evaluation and the medical and non-medical evidence as a whole." (T.18). Given the internal inconsistencies in Dr. Denk's statements, and the fact that Dr. Denk was rendering an opinion outside his area of expertise,

the ALJ did not err in giving only "some weight" to Dr. Denk's assessment.

### 2.   NPP Sharpe

NPP Sharpe, who has treated Plaintiff at the RRC since October 2010 for his ADHD and other psychiatric issues, rated Plaintiff's abilities as "unlimited or very good" in the following areas: remembering work-like procedures; maintaining regular attendance; sustaining an ordinary routine without special supervision; completing a normal workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of breaks; responding appropriately to changes in a routine work setting; and dealing with normal work stress.

In the following areas, NPP Sharpe rated Plaintiff as "limited but satisfactory": understanding, remembering, and carrying out very short, simple instructions; accepting instructions and responding appropriately to criticism; getting along with co-workers without unduly distracting them or exhibiting behavioral extremes; and being aware of normal hazards and taking appropriate precautions. (T.486).

In only two areas did NPP Sharpe rate Plaintiff as "seriously limited": maintaining attention for two-hour segments and working in coordination with, or proximity to, others without being unduly distracted. (T.486). When asked on the MRFC Questionnaire whether,

in his opinion, Plaintiff could engage in full-time competitive employment on a sustained basis, NPP Sharpe answered affirmatively. (T.488). However, as noted above in connection with Dr. Denk's opinion, this is a question exclusively reserved to the Commissioner.

In his decision, the ALJ recited the foregoing findings by NPP Sharpe and determined that NPP Sharpe's opinion should be given "significant weight, as he has a treatment relationship with . . . [Plaintiff] and his opinion is consistent with contemporaneously recorded treatment notes." (T.18). Plaintiff does not take issue with the ALJ's assignment of significant weight to NPP Sharpe's opinion but argues that the ALJ erroneously disregarded the aspects of the MRFC Questionnaire indicating "serious[ ] limit[ations]" in Plaintiff's abilities to maintain attention for two-hour segments and work in coordination with, or proximity to, others without being unduly distracted. (T.486).

Under the Commissioner's own rules, if the ALJ's "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. "While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' he cannot simply selectively choose evidence in the record that supports his conclusions." Gecevic v. Secretary of Health & Human Servs., 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (quoting Fiorello v. Heckler, 725

F.2d 174, 176 (2d Cir. 1983)). Here, the Court finds that the ALJ did not commit plain error in drafting his RFC assessment, which does not clearly conflict with NPP Sharpe's opinion. The ALJ adequately accounted for the "serious limitations" identified by NPP Sharpe by restricting Lafond to simple work tasks and minimal contact with coworkers and the public. See, e.g., Justice v. Astrue, No. 2:10-cv-00117, 2011 WL 1087937, *17, *27 (S.D. W.Va. Mar. 23, 2011)(treating source found that claimant had "seriously limited, but not precluded" ability to: "[m]aintain attention for two hour segment; [m]aintain regular attendance and be punctual within customary, usually strict tolerances; [s]ustain an ordinary routine without special supervision; [w]ork in coordination with or proximity to others without being unduly distracted; [c]omplete a normal workday and workweek without interruptions from psychologically based symptoms; [d]eal with normal work stress; [u]nderstand and remember detailed instructions"; treating source also indicated that claimant was "[u]nable to meet competitive standards" in her abilities to "[c]arry out detailed instructions; [d]eal with stress of semiskilled and skilled work"; district court found without merit claimant's argument that the ALJ wrongfully evaluated her mental impairments and incorrectly accounted for them in the RFC because "[t]he ALJ properly noted that despite [c]laimant's long history of treatment, her mental status examinations were generally within normal limits, including an

examination by Dr. Craft performed while [c]laimant was not taking any psychiatric medications due to her pregnancy. Further, the ALJ took into account [c]laimant's impaired concentration by limiting her to 'simple, easy-to-learn unskilled work due to deficiencies in concentration and substance abuse'") (internal quotations and citations omitted).

### C. Failure to Address Plaintiff's Limitations in the Ability to Deal With Stress

Consultative psychological examiner, Dr. Finnity, stated that Plaintiff "may have some difficulty" in dealing with work-related stress. (T.357). When asked on the Mental RFC form to rate Plaintiff's ability to "[d]eal with work stress", Dr. Denk, Plaintiff's pediatrician, checked "[p]oor". (T.491). Plaintiff argues that the ALJ did not adequately evaluate Plaintiff's limitations in dealing with stress or make appropriate accommodations for it in the RFC. According to Plaintiff, the ALJ thereby erroneously disregarded SSR 85-15, which "emphasizes the need to carefully evaluate a claimant's ability to deal with stress in the workplace." Sheffield v. Astrue, No. 3:11-CV-1176(GLS), 2012 WL 5966610, at *2 (N.D.N.Y. Nov. 28, 2012) (citing SSR 85-15, 1985 WL 56857, at * 5-6 (1985)).

The Court disagrees. The ALJ adequately accounted for Lafond's limitations in dealing with stress by restricting him to simple and repetitive tasks; no fast-paced production requirements; the necessity of making only simple decisions; and few, if any, changes

in the workplace. <u>Contrast</u> <u>with</u> <u>Sheffield</u>, 2012 WL 5966610, at *1-
*2 ("The ALJ found that . . . Sheffield 'maintain[ed] the
abilities (on a sustained basis) to understand, carry out, and
remember simple instructions; respond appropriately to supervision,
coworkers, and usual work situations; and deal with changes in a
routine work setting.' . . . Sheffield is correct in that the RFC
does not include any stress limitations.") (internal citations
omitted).

### D. Failure to Apply the Appropriate Legal Standards in Assessing Plaintiff's Credibility

The ALJ determined that Plaintiff's "medically determinable
impairments could reasonably be expected to cause the alleged
symptoms, however, the [Plaintiff's] statements concerning the
intensity, persistence and limiting effects of these symptoms are
not credible to the extent they are inconsistent with the above
residual functional capacity." (T.16). Plaintiff argues that in
making this finding, the ALJ did not apply the appropriate legal
standards, as set forth in SSR 96-7p and 20 C.F.R. § 416.929.

In determining whether a claimant is disabled, the
Commissioner must consider subjective evidence of pain or
disability to which the claimant testifies, but "may exercise
discretion in weighing the credibility of the claimant's testimony
in light of the other evidence in the record." <u>Genier v. Astrue</u>,
606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>) (citations omitted).

The Social Security regulations set forth a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such symptoms, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c).

"[T]o the extent that the claimant's [symptom] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003) (summary order); footnote omitted). That credibility inquiry involves consideration of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's

functional limitations and restrictions as a result of the symptoms. See 20 C.F.R. § 404.1529(c)(3)(i)-(vii). An ALJ's unfavorable credibility finding must be "set forth with sufficient specificity to permit intelligible plenary review of the record." Williams, 859 F.2d at 261.

Upon finding that Lafond's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms[,]" (T.16), the ALJ then was required to consider how and to what degree the factors outlined in 20 C.F.R. § 404.1529(c) limited Plaintiff's ability to engage in substantial gainful employment.

According to the ALJ, the limiting effects of Plaintiff's symptoms were "not credible to the extent they [we]re inconsistent with" the RFC assessment. The Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding. See, e.g., Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011) ("ALJ Wurm's analysis of Smollins's credibility is flawed not only in its brevity, but also in its acceptance as a foregone conclusion of Smollins's capacity to perform sedentary work. Instead of comparing Smollins's symptoms, as described by Smollins herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, ALJ Wurm merely

-31-

compared Smollins's statements regarding her symptoms to his own RFC assessment."); see also Ubiles v. Astrue, 11-CV-6340T MAT, 2012 WL 2572772 (W.D.N.Y. July 2, 2012); Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011); Kennedy v. Astrue, No. 3:09-CV-0670, 2010 WL 2771904, at *5 (N.D.N.Y. June 25, 2010), report and recommendation adopted, 2010 WL 2771895 (N.D.N.Y. July 12, 2010); Nelson v. Astrue, No. 5:09.CV.00909, 2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12, 2010).

However, the ALJ in Lafond's case properly went on to discuss his credibility by comparing aspects of his testimony to the record evidence. For instance, the ALJ found Lafond "less than fully credible regarding his current level of work activity, and the reason he is not currently working." (T.16). As the ALJ noted, Lafond testified that he occasionally worked for his uncle's roofing and plowing business but was not paid for the work. The uncle submitted a letter (Ex. 18E) indicating that Lafond had worked for him in 2010 and earlier in 2011, "but was unsuccessful due to his inability to follow directions and hyperactivity." (T.16). Tom Huss, who employed Lafond for about half a day while he was in high school, submitted a similar letter (Ex. 17E) indicating that Lafond was unable to perform the job functions required in his auto repair shop or adhere to the shop's safety rules. (T.16). The ALJ concluded that notwithstanding Lafond's testimony and these letters, "the evidence of record reveals that

. . . [he] has worked for his uncle's roofing business since at least April 5, 2005"; that Lafond "did not mention any difficulty performing the job functions during any of his counseling sessions, and reported that he had begun looking for other part-time work because he 'was not getting enough hours at his uncle's plowing/roofing business.'" (T.16) (citing Exs. 5F, 17F, 22F). Moreover, the ALJ found, Lafond "indicated in both treatment notes and the consultative evaluation that he believes his inability to get is [sic] job is the result of his felony conviction." (T.16) (citing Exs. 10F, 22F; 42 U.S.C. § 1382c(a)(3)(B) (stating that it is irrelevant "whether a specific job vacancy exists for [the claimant], or whether he would be hired if he applied for work")).

The ALJ then discussed Lafond's testimony concerning "the impact of his ADHD symptoms, and his desire to improve his symptoms[,]" and found it to be "less than fully credible" in light of the record evidence. As the ALJ noted, Lafond sought treatment in August 2009, for his anxiety at the GMHC, and Dr. Seeger recommended that he seek treatment at the Rochester Rehabilitation Center. However, Lafond did not follow up there until December 2010. (T.16). The ALJ noted that Lafond's lengthy delay in seeking treatment "suggests that his symptoms were not as severe as alleged." (T.16). Corroborating this finding were Lafond's Global Assessment of Functioning ("GAF") scores which, "during this period[,] were indicative of no more than moderate impairment[.]"

(T.16). Once Lafond "began treatment at [RRC] he reportedly stabilized on medication and his GAF score increased to 65, a score indicating only mild symptoms and limitations." T.16 (citing Exs. 19F, 22F, 24).

The ALJ also found Lafond "less than fully credible regardiing the extent of his ADHD on his ability to concentrate and focus." (T.17). The ALJ noted that Dan Doyle, LCSW-R, an evaluating clinician at the RRC, stated that Lafond "responded favorably to clear directions involving one or two steps to accomplish." (T.17) (quoting Ex. 20F). In addition, the consultative psychological examiner, Dr. Finnity, found that Lafond's attention, concentration, and memory were all intact based upon his successful completion of serial three's; his ability to recall three out of three objects immediately and after five minutes; and his ability to recite four digits forward and three digits backward. (T.17) (citing Ex. 10F). Dr. Rosen subsequently noted in December 2010 that Lafond's psychiatric symptoms were "minimal" in the context of treatment with Adderall.

Finally, the ALJ found Lafond "less than fully credible regarding the impact of his impairment on his social functioning" because despite his history of impulse-control problems and acting-out behaviors, "there is no evidence to suggest" that Lafond has "had any problems with his temper since being released from prison." (T.17). Furthermore, Lafond did not mention any anger

problems to his counselors at the RRC. Indeed, NPP Sharpe opined that Lafond "appears to interact appropriately with others, and has no limitations on his ability to interact appropriately with the gneral public." (T.17) (citing Exs. 22F, 24F). The ALJ noted that although Lafond testified that his "high energy level and excessive talking can irritate others, he has several good friends and interacts with them on a regular basis. (T.17).[3]

"Conclusory findings of a lack of credibility will not suffice; rather, an ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" Escalante v. Astrue, No. 11 Civ. 375, 2012 U.S. Dist. LEXIS 879, at *23, 2012 WL 13936 (S.D.N.Y. Jan. 4, 2012)) (quoting Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996)). The ALJ's credibility finding in the present case was not conclusory. He discussed in detail specific aspects of Plaintiff's testimony concerning his limitations and symptoms, compared them to the record evidence, and explained how

_____

[3]    In addition, one of his counselors at the RRC noted in October 2010 that Lafond could "redily [sic] identif[y] places and can name social cues that indicate people's response to his energy, but states '[s]ometimes you have to annoy people to get what you want'." (T.472).

he arrived at his conclusions. The ALJ did not "mis-characterize [the] claimant's testimony or afford inordinate weight to a single factor" under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). <u>Gecevic v. Secretary of Health and Human Servs.</u>, 882 F. Supp. 278, 286 (E.D.N.Y. 1995).

Plaintiff also argues that the ALJ failed to specifically evaluate the hearing testimony of his mother, (T.58-67), other than stating that her testimony corroborated Plaintiff's testimony (T.16). Plaintiff is correct that "[i]n evaluating a claim for disability, an ALJ generally must consider any testimony concerning the claimant's physical ailments and resulting RFC offered by lay witnesses during the administrative hearing." <u>Judelsohn v. Astrue</u>, 11-CV-388S, 2012 WL 2401587, at *8 (W.D.N.Y. June 25, 2012) (citations omitted) (citing <u>McArthur v. Commissioner of Social Sec.</u>, No. 3:06 Civ. 860, 2008 WL 4866049, at *10 (N.D.N.Y. Nov. 7, 2008)). An ALJ's determination that a "[lay] witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." <u>Williams on Behalf of Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988).

"The ALJ's failure to discuss such evidence can rise to the level of plain error where the lay testimony is consistent with the record evidence." <u>Judelsohn</u>, 2012 WL 2401587, at *8 (citing <u>McArthur</u>, 2008 WL 4866049, at *10). Here, however, Lafond's mother's testimony was consistent with his own testimony which the

ALJ found was not entirely supported by the record evidence after performing a detailed analysis. It logically follows that Lafond's mother's testimony is less than fully credible for the same record-based reasons as those discussed by the ALJ in analyzing Lafond's credibility. Thus, even if there was error, which the Court does not find to have been the case, it was harmless.

### E. Erroneous Use of an Incomplete Hypothetical in Connection with the VE's Testimony

At step five of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that the claimant is capable of performing other jobs existing in significant numbers in the national economy in light of his RFC, age, education, and past relevant work. 20 C.F.R. §§ 416.920, 416.960. Where, as here, the claimant's disability is based upon non-exertional impairments, use of the grids [medical vocational guidelines] as the exclusive framework for making a disability determination at step five is inappropriate. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996). In such circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).

A hypothetical question that does not present the full extent of a claimant's impairments cannot provide an adequate foundation for vocational expert testimony. Lugo v. Chater, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996)("The record . . . indicates that the

vocational expert's testimony is unreliable because the ALJ's questioning was based on hypothetical examples which did not accurately describe Lugo's abilities. . . . None of the hypotheticals included the left eye pain of which Lugo complains and which, combined with Lugo's other impairments, may make him unable to perform the jobs the vocational expert listed."); see generally De Leon v. Secretary, 734 F.2d 930, 935 (2d Cir. 1984) ("Although he summarized the psychologist's report in his decision, the ALJ did not test the report's conclusions by presenting them in hypothetical questions to the vocational consultant" and therefore committed legal error.). As discussed above, however, the ALJ adequately accounted for Lafond's limitations in the RFC assessment and in the hypothetical presented to the ALJ.

**F.    Failure to Accept the VE's Testimony that Plaintiff Cannot Work**

After the VE presented her opinion as to the jobs that Plaintiff could perform based upon the hypothetical with which Plaintiff takes issue, the ALJ asked the VE to "assume a hypothetical individual having the same age, education and work experience, or lack of work experience as [Plaintiff], and the abilities and limitations that were set forth in the testimony at this hearing today, would such an individual be able to perform any occupations that exist in significant numbers[.]" (T.71). The VE stated, "No, absolutely not[,]" (T.71), and expanded upon her opinion as follows:

> [M]y background is special [e]d[ucation]. This young man
> testified so well, very bright young man. . . with
> numerous problems. And I would like to – in the future
> with the help of DOORS (PHONETIC) or some other agencies,
> it would be wonderful if he could work. But with the
> testimony today, no, he cannot work.

(T.71). The ALJ inquired as to which factors in particular informed

her opinion, and the VE stated she was "very much convinced" that

he "cannot stay on task" even though "he doesn't want this to

happen[.]" (T.71). In addition, the VE identified Lafond's "acting

out, which is certainly [present] through his record" as well as

the "constant talking", noting that these behaviors "would keep

other people from working also. . . ." (T.72). The VE commented

that with Lafond's history of "oppositional behavior . . . even in

jail," she "could see where . . . he would lash out at jobs because

of the oppositional [behavior]." (T.72). The VE stated that

Lafond's symptoms were "very consistent with people with severe

ADHD, and then of course throwing in the bipolar [disorder]."

For several reasons, the Court finds that this opinion by the

VE does not constitute "substantial evidence" of disability. First,

the opinion was based solely on Lafond's and his mother's testimony

which, as discussed above, the ALJ partially discounted as less

than credible for reasons that are well-supported by the record

evidence. Second, the VE's opinion was based upon stale

information: Lafond has not had problems with oppositional

behaviors since his incarceration, and it appears to be an issue

that has resolved through, _inter_ _alia_, Lafond's work with his

therapists to gain insight about himself. (E.g., T.465, 470, 472).
Third, to the extent that the VE attributed his limitations and
symptoms to bipolar disorder, this diagnosis has been refuted by
one Lafond's psychiatrists. (T.382-38). Accordingly, the ALJ was
not bound by the VE's opinion that Lafond is incapable of working.
Notably, that the VE opined that Lafond would be capable of working
if he were to obtain additional vocational/rehabilitative services.
In other words, by the VE's own testimony, her opinion as to
Lafond's inability to work is not static.

**VIII.    Conclusion**

For the foregoing reasons, the Commissioner's decision denying
disability benefits is affirmed. Accordingly, it is hereby ordered
that Defendant's motion for judgment on the pleadings is granted;
Plaintiff's motion for judgment on the pleadings is denied; and
Plaintiff's complaint is dismissed.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     February 28, 2013
           Rochester, New York